Campo Flores and Flores De Frentes. Good morning. Good morning, Your Honor. May it please the court, my name is Randall Jackson. And I represent appellate Efren Campo Flores. Your Honors, the case before the court today represents a failure of the justice system. We would submit on the most serious levels. This was the rarest of so-called sting operations where no drugs were ever seized during the course of the investigation. No money was ever delivered during the course of the investigation. And more importantly, Your Honors, this was the rarest of criminal trials where the key government witness, the person who was responsible for orchestrating all the interaction with the defendants during the course of the operation, and the person who was the most important witness during the testimony at trial, perjured himself so significantly that the government was forced to rip up his cooperation agreement before he completed his testimony, after he was exposed that he had lied over and over again. That's Santos Pena. That's Santos Pena, Your Honor. And just to put in perspective. But the judge told the jury, this person perjured himself and you can, if you like, you can credit nothing that comes out of his mouth. So what do you do if the jury does anyway? Your Honor, I think we have to look at the record and look at what happened in the case. And I think that that goes to the heart of the problem in terms of the three key evidentiary errors that we talked about in our briefs. And I just want to focus in on the first one, on how it wasn't cured by any simple instruction to the jury that they could disregard parts of the testimony. If we look at the first- Or all of it. Or all of it. Or all of it. But with regard to that first evidentiary error, Judge Jacobs, the decision to allow the defendant, Mr. Santos Pena, to offer expert testimony, identifying the only substance that was ever seen during the course of the investigation. That the government purported was cocaine. To allow that person to offer expert testimony was something that could not be cured by a simple instruction. This was the only, to be very clear, this was the only substance that was ever seen. And what occurred here is that the witness described what was almost unquestionably a chemical test that he said he was conducting on the basis of his specialized experience as a member of the Sinaloa cartel. So this brings it clearly within the scope of rule 702. And what he described was rubbing the powder until it purportedly emitted some sort of oil or butter. And that by the visual investigation of that, and at a later point he said that he could detect some smell of it. But then on the basis of that, he was able to determine that this was cocaine of a high purity. Your Honor, if that is not 702 testimony based on specialized knowledge, specialized knowledge, then the entire purpose of Kumho-Tyre, expanding the scope of what we understand to be testimony that has to be subjected to the analysis of 702 is lost. There's no question that his testimony had expert aspects to it and that he couldn't testify to that unless he had the experience that was necessary to do that. But he did this for, apparently his nose and his feel and his eye was good enough for cartels in buying this stuff. And it's not as though somebody just said, looks like cocaine to me, he was a person who was in the business. Well, Your Honor, I would submit that we didn't get a chance to appropriately test that question. We got limited testimony about his background in the cartel, where what we really learned is that he was a person whose main job was being responsible for some kidnappings and murder. We got limited information about that. We heard about this in a hearing that was not very long before the trial for the first time that he had conducted this test. And at the end of the day, the affidavit that we submitted from one of the leading experts in the analysis of cocaine and drug testing says that the method that he described was scientifically impossible. Now, if we had gone through the appropriate Daubert hearing that was required, we would have been able to probe the question of exactly what his background was on this subject. Is this scientifically appropriate testimony? And it would have been clear that it was not. It is impossible, and this is what Dr. Holmes' affidavit demonstrates that we submitted in connection with our post-trial briefing. It is impossible to rub a powder and accelerate it to the point that it's going to emit any sort of butter. It's also impossible for a human being to smell cocaine and smell a substance that he's been rubbing and determine that it's cocaine. Now, your honors, I have reserved some time, but in the remainder of my time here, I do want to focus a bit. We think that that was a serious error that requires reversal. I do want to focus a bit on the other two evidentiary errors that we focused in on our briefs. One of them was the decision to allow the agent and Judge Santos-Pena to interpret the defendant's statements. And we submit that this was another grave error in this trial that requires reversal. Essentially, it was not an interpretation of a transcript. This person was in the conversation and was testifying to what was being conveyed to him. And your honor, that's exactly, I agree, your honor, and Judge Jacobs, that's exactly what this court said in United States v. Cruz is not allowed. In United States v. Cruz, the agent was describing a post-arrest conversation with the defendant. And there were ambiguous statements made by the defendant about what occurred during the course of the drug deal. And then, the government said, well, what did you understand and mean by that? And he espoused his theory as to what the defendant's ambiguous statements meant. And this court said, that is absolutely improper and requires reversal. This case is exactly like Cruz, only we would submit, your honor, it's worse. Because in Cruz, the statement was not nearly as bad as the statement here, where the ambiguous statements that we're focused in on, the agent transformed into fully inculpatory statements. There was a statement where Mr. Campoflores said, you know what that is, which is as ambiguous as it can be. And the government asked, over our objection, over our repeated objection, what did you understand him to mean by that? Reach into his mind and offer your own interpretation as a federal agent. And he said, I understood him to mean that that was cocaine. And your honor, that went right to the heart of the issues at trial. The same thing occurred with regard to Mr. Santos-Pena and his interpretations of each of the defendant's statements throughout the recordings. Where there were ambiguous statements made, and Santos-Pena, who was not a co-conspirator, and was really much more of a government agent. He was a long-term contract employee, went on to interpret each one of these ambiguous statements, tainting the trial in a way that was impossible for us to repair. Could you address your argument concerning conscious avoidance? Yes, your honor, and I do want to emphasize that my colleague is more focused on the conscious avoidance. The conscious avoidance, I do want to emphasize that his brief focuses on that. We fully adopt the conscious avoidance argument, and I don't want to step on his argument, but I do want to say one thing about it, your honor. This simply was not a case where conscious avoidance instruction was proper. This was a case where the knowledge element that was required, specific knowledge that the cocaine was coming to the United States, simply does not comport with the concept of conscious avoidance as is described in this court's precedence. It makes no sense in the context of this type of sting investigation, but I'll leave for Mr. Levy to describe that in more detail. That's a perfect segue. Thank you very much, your honor. And you've reserved rebuttal. Thank you, your honor. Appreciate the court. May it please the court, my name is Michael Levy. I represent Frankie Flores, that is a perfect segue. It's not a perfect segue to where I was going to go first, but I'm happy to address it if that's the question that your honor has. On conscious avoidance, the issue here is that conscious avoidance has two parts. And that was known to both the government and the court at the time of the trial. It involves the defendant's awareness of a high probability that a relevant fact exists. And second, evidence that the defendants, from which a jury can conclude beyond a reasonable doubt, that the defendants deliberately avoided confirming that fact. The defendants pointed out that there was no evidence of this second element. In advance of the charging conference, put in a letter saying whatever else there is about the high probability of the fact that these drugs were going to the United States. By the way, these drugs were never going to the United States. This was all a sting operation. So it gets a little bit strange to talk about knowledge as opposed to, I guess, what I would call belief. But the defendants pointed out that whatever there is to say about the high probability that the drugs were going to the United States, there was nothing in the record. The defense essentially laid down a challenge. There's nothing in the record to show that if these defendants were unaware of that fact, that it was because they deliberately chose to avoid knowledge. At the charging conference, the government avoided that question entirely. Never, never pointed out anything that went to the second element of conscious avoidance. The court, in finding that an instruction would be given, never said anything about that second element, focused entirely on the first element. When the government eventually, in its rebuttal summation, talked about conscious avoidance, it talked only about the high probability, never pointed to a single thing that suggested that these defendants had deliberately avoided the knowledge if they didn't have the knowledge. And so that's the way the trial progressed, as though the second element of conscious avoidance didn't exist at all. And the reason is there was no evidence of it. There actually, the defense was right. There was insufficient evidence of that second element. This was a knowledge case. These defendants either knew or they did not know. So there would be really no basis for assuming that the jury could have reached its verdict on that basis? That is not the way, I understand that line of cases for sufficiency challenges. That is not the way this court has seen conscious avoidance challenges. And Ferrarini is an example of that. This court has recognized that there is an opportunity for confusion when both knowledge and conscious avoidance are pressed. But there's really no evidence of conscious avoidance in that no matter how much you tell the jury, don't convict based on recklessness, don't convict based on negligence. This court has expressly said in Ferrarini that giving a conscious avoidance instruction where it's unwarranted means the jury could, quote, conclude that no actual knowledge existed, but might nonetheless convict if it believed that the defendant had not tried hard enough to learn the truth. So I understand your Honor's point that in other sufficiency of the evidence context, we assume that if there was insufficient evidence, then the jury must not have convicted based on that. That's not what this court has done in the conscious avoidance context. It is- Thank you. I derailed other points you wanted to raise. So the point that I wanted to focus on, and it's of a piece with the government's overall strategy at this trial. That whatever other evidence the government had, the central issue at trial was whether or not the defendants had the intent to import or knew that the drugs would be imported into the United States. That evidence on that element was actually quite thin. And the government, in a variety of ways, tried to bolster its case to press every advantage, including several unfair and illegal advantages, to try to get over what they recognized was a significant hurdle. One we just talked about was to lower the hurdle altogether. The other is 80% of drugs that take this route end up in the United States. That is, again, goes to knowledge, and it came in, and I don't believe there was an objection to the proof. I'm not here saying that there wasn't evidence that the government could have offered, but recognizing that the evidence was thin. And by the way, there was no reason to believe that our clients knew that statistic. But with respect to trying to clear the hurdle, the main piece of evidence was the so-called confessions of the defendant. The government recognized that fully. The government opened by immediately turning to the last chronological event in the entire narrative, the post-arrest statements, in which the defendant supposedly said, we knew these drugs were going to the United States. In putting on its case, the government called its second witness, effectively the kind of first narrative fact it put in, was the last narrative fact chronologically. The fact that these defendants had supposedly made this post-arrest confession on this one critical issue that was central to the trial. In summation, the government made it perfectly clear. They opened their summation by saying, this case is about the confessions. If you believe the confessions, you can stop listening to me here. The defendants are guilty, quote, full period stop. That's what the defendant said. The confessions were everything, and the government realized that. The confessions, if they happened, should have been proved through the testimony of the agent who took them. That is the appropriate way to put that in. That's what this court recognized in Quinto, that's what has been recognized in any number of cases. What the government did here, though, was bolster, pre-bolster its case by putting in a written DEA report. Typed, detailed on DEA letterhead, and that is reversible error for exactly the reasons that this court decided in Quinto. This case is exactly like Quinto in every material respect. And like the First Circuit case, Lozada Rivera, where the First Circuit did the same thing. The central issue, as in Quinto, was the intent. The central evidence of intent, as in Quinto, was this disputed post-arrest statement in which the government claimed, and the defendants disputed. And the jury believed it. The jury ultimately believed it because they saw a DEA report that said it. And this court in Quinto said, that is improper, and it's prejudiced, and it's not harmless. And that the court had no doubt that once the written DEA report came in, that any dispute about the veracity of the agent's testimony about what happened in that post-arrest was done. That it would be, I think in this court's words, the unusual juror who could possibly have any doubt about the government's version of what happened in that post-arrest once the DEA report of it came in improperly. So as in Quinto, this DEA report, which was powerfully prejudicial, as this court has recognized, was allowed to come in with no basis whatsoever. And then the government exploited it for everything it was worth. Once the report came in, before this agent had ever testified, before this agent had ever been impeached, challenged on any aspect of anything, this report came in, the government made it all about that report. It was never again for a moment about the agent's testimony about what happened in the post-arrest interview. The government put the report in for my client, for Mr. Flores, before the agent had even said a word about what happened in the post-arrest interview. The report gets introduced into evidence over objection. In summation, the- I'm sorry to remind you, did the agent eventually thereafter testify as to what statements made? He did, and this court has said, this court is fully aware in Quinto that that's exactly the situation. Yes, the answer is yes, that he eventually testified about it. So there was both his testimony and there was the report. His testimony came after the- After the report was already in, that's correct. And that's, it is that sequence that's basically what you're- No, the sequence would not matter, Your Honor. Even if he had testified first and then the report had come in, what this court has found in Quinto to be so powerfully prejudicial was once the report comes in, at any point, and this court recognized fully in Quinto that the IRS agent there had testified, and had said effectively the same thing as was in the report, right? That he testifies that there's this confession. In that case, he testified first, and then the report improperly came in. And this court said, we recognize fully that the agent has testified from his memory about most of the things that are in the report, but that was challengeable in essence. That was something that could be debated by the parties and the jury would have to decide. Once the report came in, the debate was over. It would be impossible, this court found, for a jury not to conclude that the agent was telling the truth. Once his hearsay report, multiple pages, lots of detail, DEA letterhead in that case, IRS. If you look at Quinto, there is no material difference between this case and that case. An improper DEA report just sabotages the central piece of dispute in the case and requires vacating and remanding. And again, the first circuit found the same thing on the same grounds. What would have made it proper, if any? To allow the DEA report. There are reasons prior consistent statements come in. There just weren't any in this case. Nor, to be honest, did the district court find any. The only explanation the district court ever gave on this entire subject was, I'll allow it. There was nothing, not a word of explanation for why it came in. One important point on that, and we make this point in our brief, is there is no case in which this court has ever allowed a prior consistent statement to come in before the witness had been impeached. Here, the defense had barely sat down from their opening statement when the government, laying in wait, dying to get this DEA report in, jumps up, waves it around, and offers it in, saying it's now a prior consistent statement. There is no case in which this court has ever found, and the court has expressly said to the contrary, that you can get a prior consistent statement in before the witness has at least been impeached first. The only case that even comes close is O'Connor, which was a decision by Your Honor Judge Kearse. And in that case, it wasn't admitted as a prior consistent statement at all. At trial, it had been admitted, this prior statement had been admitted as a state of mind exception. And this court on appellate review said, well, it wasn't really a state of mind exception, it shouldn't have come in for that, but it could have come in as a prior consistent statement. And we can see that in the opening statement and over the course of the trial, that that was appropriate. So it was essentially appellate review that said, okay, this could have come in for that. You will not find a case in which this court has ever contradicted its express statement that it should await impeachment. And here it did not. You've reserved rebuttal. I have, thank you. We'll hear you then. We'll hear the United States. Thank you, Your Honor. May it please the court. My name is Emil Bovey. I represent the government on appeal, and I represented the government in the district court. This is a case where the defendants were caught red-handed committing this crime. There were seven meetings in three countries over the course of about six weeks. Those meetings yielded about 26 audio and video recordings documenting what happened there. The DA seized phones from the defendants. We offered about 25 chat electronic communications between the defendants and co-conspirators and associates regarding this crime. And there were another ten strings that overlapped to some extent between Campo and Santos Pena, all documenting on video and in writing this crime. On intent as well. Yes, Your Honor, on intent as well. Why do you need conscious avoidance? We were permitted to seek both, and I think really the crux- That I know. The crux of this, Your Honor, is a point that the defendants actually made in their closings. There were 13 times in these meetings over the course of October and November 2015 when the sources made reference to the fact that the cocaine that the defendants were to provide would be brought to the United States. Now on the one hand, those statements by the sources on these recordings do support a finding of actual knowledge. On the other hand, the statements by the sources coupled with a lack of response by the defendants support an inference that they intentionally were not responding to avoid creating objective evidence that they had agreed to do this. Is that the same thing as conscious avoidance? To be so cautious that you don't allow yourself to speak a guilt that you're fully aware of? I think this went further than that, Judge, and it really goes to a theme that Your Honor struck in United States versus CUNY. When there's an argument about a lack of knowledge plus evidence of deep involvement of a scheme, that's the type of situation that all but calls out for a conscious avoidance instruction. And this wasn't, the evidence here, it wasn't just from our perspective, the defendants being cautious. It supported an inference that they were being intentional. They were intentionally not responding to that aspect of the negotiations to avoid exposing, or to try and avoid exposing themselves to criminal liability in the United States. And that's supported by other aspects of the record. At one point during the meetings in Caracas, Flores says the DEA is not even down here. And that's also consistent with people, a group of defendants who are mindful of the exposure that they face and are trying to be careful to participate in a drug transaction, but to limit their exposure under US law. Another part of the evidence that supports this inference that provided the factual predicate for the conscious avoidance instruction was the structure of the deal itself. And the structure of the deal was for the defendants to provide that cocaine, have it flown on a private jet from Venezuela to Honduras, and then seek to sort of absolve themselves from responsibility for that. The expert, Special Agent Mahoney, explained why that practice arose. As law enforcement in South and Central America became more effective at seizing drug shipments like this, traffickers in Colombia and Venezuela, South America, started to segment the way that they sent these shipments toward the United States. To keep themselves from having to talk about importation, to avoid having to deal directly with Mexican drug traffickers, the Sinaloa cartel, who would themselves be responsible for personally importing the drugs. And the evidence here was sufficient to support an inference also that the defendants were aware of these patterns. Campo, in Haiti, talks about being connected to a high ranking member of the FARC, a foreign terrorist organization that is the largest producer of cocaine in the United States. So both Judge Crotty and the jury were certainly entitled to put all these facts together. The defendant's behavior in these meetings, the defendant's structuring of this deal, and the expert testimony about why the deal was in fact structured this way. To basically apply CUTI and give the conscious avoidance instruction. And CUTI has been applied by this court, in a summary order that we cite, HENRA, involving an importation situation. This is not a novel or exotic application of conscious avoidance in an importation case. And the first case that- Passing over all of these issues and touching on an interesting subject involving sentencing, the airplane exception. The airplane enhancement, it speaks in terms of an airplane sort of having been used. Not only was none used here, but there was no, the airplane itself was fictive. And I sort of, you know, I mean, if you really look at this, if the enhancement was based on the use of a tricycle, then the government could have said, well, we're going to use a tricycle. You understand that, we're using a tricycle. And then you get the enhancement, you could just make it up. I think that there's generally room for that type of concern in sting investigations, but that concern did not arise here, because in this case, the defendants from the first meeting, on October 3rd, 2015, themselves spoke in terms of using private planes to ship drugs from Micotia Airport north towards Honduras. The chats in their phones reflected communications about using private planes before the sources ever got involved, before the sting ever started. So I don't think this was a case where the sting sort of manipulated the application of an enhancement. There are two points- In that, I mean, there are, I think, in the Ninth Circuit, there's substantial question about whether that enhancement can apply in this kind of case. And so, Judge- Assuming everything else is affirmed. That case, Judge, in the case that followed it, when we're at two on the circuit, failed to grapple with two of the really fundamental issues that supported Judge Crotty's application of this enhancement. The first, and now there's precedent in the circuit for this under Romero, and also the summary order in Suarez, is that importation is a continuous process, starts in South America where the drugs are produced, and continues until the drugs get to the United States. So a defendant to be involved in importation doesn't have to be at the US-Mexico border, doesn't have to carry the drugs in the United States. That's, I think- So you're saying that the person who packs it in a field in Columbia and puts it on a mule and brings it to the next stage could also be hit with this enhancement because in the end, how does it get here? Yeah, except by airplane. I think there are other ways that cocaine can reach the United States, maritime routes. Absolutely, so I think- Not only the private planes. What we're talking about now. This enhancement. It's not commercial. Yes, Judge. And so I think, I've raised the first legal point that I think is fundamental to the correct application of this enhancement. That is, that importation starts in South America and using a private jet from Venezuela to Honduras is using a jet in importation. The second point that the Ninth Circuit case doesn't grapple with at all is the importance of applying the relevant conduct guideline. And I'd like to engage a little bit in an argument that's made in the Flores reply brief that basically, the court, Judge Crotty should have in this court should ignore 1B1.3, the relevant conduct guideline. That's just contrary to the way the guidelines are written. Start with the statutory violation here, 21 U.S.C. 963. You go to the statutory index in the guidelines. Here, that index directs us to offense guidelines in the 2D1 section of the guidelines, not to 2X1.1. When you turn to 2D1.1, the title of that guideline expressly includes conspiracies like the section 963 violation at issue here. And that alone is sufficient to make clear that the conspiracy at issue, you look to 2D1.1, not 2X1.1. 1B1.3 says in the introductory language, all enhancements are to be applied based on relevant conduct as defined in this section. Lastly, 2X1.1, the title says this applies to conspiracies not covered by another guideline. There's a cross reference that says where another guideline expressly covers a conspiracy, apply that guideline, not 2D1.1. There's an application note in 2X1.1 that says 2D1.1 applies. So really fundamentally to the court's application of this enhancement was the convergence of 1B1.3 and the 2D1.1 enhancement. There are three different ways under the relevant conduct guideline that there was a factual basis for this enhancement. One was that importing cocaine using a private aircraft was very much the harm that was the object of this conspiracy. They were convicted of participating in this conspiracy, and it's clear from the first recordings, and it's clear before the sting even started, in the chats with Pepe regarding the totally separate Mexican drug traffickers, that they were going to use private aircraft to import these drugs. That's basis number one. Basis number two in the relevant conduct guideline. There was an existing course of conduct involving drug shipments like this, shipping cocaine from Venezuela to Honduras using private jets. That's also reflected in the chats. There are statements by Campo about having used a G2 before. There are statements, Campo actually says at one point, I've been doing this since I was 18. At another point, he says to Santos Pena, we've been working with some other people from where you are. What is he saying there? Santos Pena is Mexican, and Campo can see that by talking to him and just observing him. And he's saying, he's confirming on a recording, we've been working with other Mexicans to do this. So there's another basis to apply this enhancement. It's the existing course of conduct. In any of these, individual defendant's statements are admissible against both of them to apply the enhancement. The last of the three bases for applying the relevant conduct guideline to apply this enhancement is that the defendants counseled and commanded others to do this. Flores admits in his confession, there were six bodyguards who knew what was going on, and they were going to help me load the plane. The bodyguards were working for Campo and Flores. And I think it's important to note, generally when we're talking about these enhancements, Judge Crotty is making findings based on a preponderance. And so based on Flores' statement that they were going to use bodyguards to actually load the cocaine shipment, that's yet a third basis to have applied this enhancement. I think, if I could circle back to the issue with Special Agent Gonzalez's notes. There are a couple points, unless there are other things the court would like me to address on that. Go ahead on that point. These opening statements in three different ways open the door to those notes. First, under the first prong of the rule we cite, there were arguments by both counsel about recent events that gave Special Agent Gonzalez a motive to exaggerate, to fabricate testimony about these confessions. That prong of the rule applies to both an express charge of a recent motive, as well as an implied charge of a recent motive. And it was not an abuse of discretion by Judge Crotty to find that these arguments about the sources having been arrested and charged and prosecuted right before the trial began, within months of the trial, that those themes charged a recent motive, and that the notes were admissible on that basis. The second way that they opened the door were arguments that the advisory committee notes refer to as a charge of faulty memory. And there's an argument in the opening statement that we cite in our briefs. When the agent tells you what he recalls of those hour-long statements a year later, you will have only his word for it without any way to verify what he is saying. So that is something that the advisory committee explicitly called out as a basis for permitting these notes and reports to come in when the door is open. And there's some back and forth in the briefs about whether cross-examination is required before the door is open. I think O'Connor makes pretty clear that that's not the case. There are some other cases that we cite in a footnote on page 78 that suggests the same thing. There's no requirement in the text of the rule that there's a sequencing here. What's necessary is that at some point, the defendants have an opportunity to cross-examine the witness about these notes. They certainly had that opportunity here. The third basis that the- All the bases were in opening statements. Is that right? Yes, Judge. That is right. There's a point, though, that I'd like to make factually about the way that these reports were treated during the trial. Special Agent Gonzalez was the second witness who testified. He began his testimony on the first day of the trial. We laid the foundation for those notes and reports as to both defendants' confessions, and we offered them, but did not show them to the jury. On the first day of that trial, all the jury heard was testimony regarding the confessions. The reason that we approached it that way, there were two. One was that there were still some brutal issues posed by the notes, that is one defendant referring to the other, that we wanted to address with counsel that night. The other is that it was clear there was going to be additional briefing that night on this issue. And so we were not able to offer them because they weren't in a state that they could have been offered, and we didn't show them to the jury. That night, we invoked both prongs of the rule and described these bases that I've described today. That's a letter at docket 113. And then the next day, after Judge Crotty, basically, he heard the defendant's motion for consideration. He said, I'm going to stand by my ruling. That's the point at which the jurors were shown these notes and these reports. Another part that I think is relevant in the court's consideration about how Judge Crotty approached this, when we raised this after the opening, he heard argument. And then there's a point in the transcript where it says, what rule are you citing? And he literally took the book out. He read the rules. He read the advisory committee language that I've drawn this court's attention to today. And it's on that basis, after reviewing the authority and hearing argument, that he made the first ruling. And then when he hears the defendant's motion for reconsideration, he had an opportunity to review briefing from both parties and came back the next day and stuck with that ruling. I would like to address the Kinto case, which is obviously central to both defendants' arguments about the notes. That was a different situation. In Kinto, the balance of the evidence was an agent testified about the interview.  It was only at that point, after there were these two parts of the testimony, that the judge let this report in. Here, the evidence from the government was not limited, by a long shot, to testimony or these reports about state of mind. It's on the recordings, both as to actual knowledge and conscious avoidance, when the sources say 13 times, these drugs are going to the United States. The evidence on this specific issue of intent to import cocaine into the United States was far stronger at this trial than in Kinto. Another thing that I think was relevant to the court's analysis in Kinto was that the prosecutor's only argument there is that there had been a general attack on the agent's credibility. That's language that you see in the Flores briefs. That's language that the prosecutor conceded. In this case, after the openings, there were three separate bases, any one of which, and certainly taken together, opened the door to those notes. The last part that I think is relevant to thinking about how Kinto can apply in this case, is the way in which that IRS memorandum was offered in Kinto. In that case, because the judge only determined that the memo was going to come in after the defendant's testimony, basically the government was permitted to, by the way the opinion reads, explain it a little bit to the jury, pass it out to them, and then they took it back into the jury room. So having heard the government's witness in the beginning of the trial, a defense witness, the defendant who disputed that account at the end of the trial, the case was permitted to close and go to the jury with the government simply handing out this memo saying this is what happened. That's not what happened here, as I've explained. The defendants were permitted to cross and examine about the notes and about these reports. They were able to challenge it, and that's why Judge Carotti did not abuse his discretion in permitting these. And to the extent he did, that the error is harmless because of the other overwhelming evidence of intent, most notably the recordings. Thank you. Thank you. Your Honor, I just want to respond to a couple of things that Mr. Boves said. First, the suggestion that the argument that was made during the opening statement by one of the defense attorneys related, opened the door to this type of admission of evidence doesn't make any sense. What was actually said- Just a comment, you won't hear any corroboration of this. Right, exactly. And what was said, Judge Jacobs, right before the sentence that was quoted by Mr. Boves is, so while you will hear much, just before this is, in this case, you will see that the DEA agent made an inexplicable decision not to record the defendant's statements. And the agents did that despite the fact that they had phones and all other kinds of recording equipment at hand while on the private airplane. So while you will hear much about the defendant's supposed confessions, you will not get to hear defendant's actual words, see their demeanor when they spoke to the agents, assess the conditions of the in-flight interrogation, and generally see whether they were even advised of their constitutional rights. The point that was being made by the defense attorney at that point is that the agents who had an astounding assortment of recording equipment had made the express decision not to record the post arrest statements. And that actually ties into the third evidentiary error that we talk about in our brief, Your Honor, that we thought was- Isn't there a problem recording things when you have the drone of an airplane? Not at all, Your Honor, not at all. It's completely, the recording equipment that the DEA had in its possession was of such high quality that it was capable of recording in loud restaurants, capable of recording in any number of settings, they had a phone. If it was so loud on the plane, I seriously doubt that they could have understood the conversation, which was apparently taking place in Spanish, as the DEA agent was simultaneously translating into English. And I would just say, Your Honor, the failure to allow us to cross-examine the DEA agents on the DOJ policy that required them at that time to record this type of statement. I'm not sure it required them at that time, because they were in an airplane and they were not in a, I mean, you're characterizing it as an environment in which all of these things are available. But that DOJ requirement is limited. It doesn't seem technically to . . . I grant you, I'm sure they could have recorded it and the point was made, but I'm not sure it was a violation of the policy. Well, Your Honor, I would say even if one would debate, and I think that the policy itself, to our . . . on its face, includes any place of detention. And here you have the defendant's leg shackled and arm shackled in an airplane for hours, mainly in U.S. territory. But even if there was a debate about that, that should have been for the jury to determine. It shouldn't have been precluded from the discussion about whether or not this was something that demonstrated bias that undermined that. Wasn't that the subject of questioning from prior witnesses? So that the jury knew that there was this DOJ requirement or suggestion? No, Your Honor. We were precluded entirely at trial from cross-examining the witnesses at all about the DOJ policy. And that is what we were talking about in the section that was quoted by the prosecutor, was the limited area that we were allowed to get into, which was just the fact that they didn't record. Without the underlying information, that there actually was a policy that we could have argued to the jury, required, in our view, them to record it. Were you able to demonstrate, to bring out that they could have recorded it, and that they had the equipment to do it? We were allowed to make that argument. But the argument was, we would say, we would suggest, Your Honor, significantly crippled by the ability- The question comes down to whether an airplane is a place of confinement. I mean, it is in one sense, but it's not classically. I think, Your Honor, the question comes down to, is it appropriate for a district court where there's a critical piece of information like this on a rule 403 determination to preclude the defense from putting that before the jury and helping it to be part of the mix of information. And determining a piece of evidence as significant as the confessions were, the alleged confessions in this case. If I could just say one more thing, Your Honor. Your Honor's tricycle point, we think, goes not only to the evidentiary issues raised in connection with the airplane enhancement, which was clearly improperly put in, but it goes to all of the sufficiency arguments we asked the court to take a very strong look at. Because that's what happened here. They just said tricycle over and over, and there was no actual evidence of the defendant's intent or knowledge as we set out in our papers. Appreciate the court's time. Thank you. Thank you. Your Honor, I'd like to come back to the issue of the DEA report of the confession, because it really is our clearest example of reversible error on all fours with a decision this court has already rendered in Quinto. I hear the government to be saying this case is somehow different, that although Quinto said, having concluded that the memorandum was improperly admitted, we do not hesitate to decide that it was not harmless. I take it the government is arguing somehow the confession was less central to this case. It had other evidence, and in Quinto it was more central. I'd like to read to you from the beginning of the government's summation to the jury. They spend about a page or two talking about the law, and then they say, so that's the law. Let's talk about the evidence. I want to start at the end of the charged conspiracy a few hours after the defendant's arrest in Haiti on November 10, 2015, when both defendants confessed to their participation in this conspiracy. Then one sentence later, if you credit the defendant's confessions, ladies and gentlemen, then this case is over, and the defendants are guilty. That's it, full period stop. Then they proceed to put the DEA report of the confession, not transcript experts of Agent Gonzales' testimony about it. The DEA report, and they put it up and they spend- And that doesn't say there's not going to be any other evidence. I mean, full stop doesn't mean we're going to stop. It doesn't, but the point on this is, if the DEA report was not admissible, the argument that it was harmless, that it didn't sway the jury, is laughable. The government said, you don't even need to listen to our other evidence, you have the confession. So if the DEA report shouldn't have come in, there can be no harmlessness argument. Now, on the subject of whether it should have come in, the government has said, any basis for it coming in was in the defense opening statement. First of all, you will find no case anywhere in this circuit, and the Fourth Circuit has expressly said you can't do this, that says you can open the door in an opening statement. The government cites a bunch of cases and we deal with them in our reply brief. We cite a bunch of cases. This court has been clear that you have to see what the impeachment is. So something can't be a prior consistent statement until you have seen what the impeachment is that it's going to. In this particular case, there was not a charge of faulty memory in the defense opening. There were maybe three words in there that the government was dying to understand that. Why can't the door be opened in an opening statement? If it conceivably could be. There may be no case that says that, but that's why we turn the lights on. It at a minimum would have to be an express challenge of the agent's memory. There was nothing like that here. I mean, if this is going to be the first case where this court ever says that, and in fact, the court has expressly said otherwise, has said you should see the impeachment first. There are about three words that the government willfully misinterpreted as a challenge to the agent's memory. It was not expressed. There was never an express. The government interpreted as implicitly challenging the agent's memory. The defense had made clear, we're not challenging memory, we're saying he was a liar from the beginning. We're saying he went into this thing, didn't take a recorder because he wanted to be able to give his own narrative. That's fully inconsistent with a challenge to memory. You can't say somebody's going to get up there and lie to you and he's going to misremember. We were making a challenge on the strategic decision to lie about it from the very beginning. Two minutes after the defense sat down and the government popped up waving this DEA report it had been dying to get in, the defense expressly disavowed the challenge to the memory and said that's not what we said at all. Your Honor, we said that he had a motive from way back when to lie about this and he's following through on that motive. Another thing, it would have been nonsensical for the defense to challenge based on faulty memory. The DEA report existed, the contemporaneous notes existed. What defense attorney would say, he's going to get up there and he's not going to be able to remember it all knowing full well that they're going to get beat down with this DEA, contemporaneous DEA report. There was no challenge to this agent's memory. The government wanted there to be one so that it could jump in with the implication and put in the DEA report. But it simply did not exist. And as I said, if this DEA report was inadmissible, then it is not harmless. This court has clearly found that it was not harmless in Quinto and the First Circuit did. The government conceded it wasn't harmless in the First Circuit case and the court wholeheartedly agreed. Can I touch for one second on the sentencing issue, because I haven't had a chance to talk about that. On the airplane enhancement, I didn't fully follow opposing counsel's stitching together of various guidelines, provisions. I think the simple answer is the airplane provision speaks in the past tense. It says if a private airplane was used, they want to do something with relevant conduct in 1B1.3. I don't fully understand what, but 1B1.3 speaks in the past tense about conduct that occurred during the commission of the offense. Neither of those provisions says if it was planned, and that's what the Ninth Circuit said. The Ninth Circuit said the mere fact that you plan to use a plane at some point is not enough. The guideline enhancement speaks to actually using one. It also said the plane has to be used to bring it across the border. It can't just be used at some random step along the way. Why would that be a sound analysis? The second part of that? It has to be brought across the United States border. Because it says a private plane was used to import, not a private plane was used to move the drugs from one part of Venezuela to another part of Venezuela. And from there on, no plane was ever used in the importation. It says to import or export, so- Import or export. If you're headed to the US and you take it out of Guatemala and bring it into Mexico and then take off again. I think, Your Honor, that it's fairly clear that the guideline is speaking to importing into the US and exporting from the US. And that those terms, import and export, don't just mean at some international border somewhere else in the world. And here, there was no importation. And it was never even planned to be with a plane if there had been importation to the US. Those guidelines and the relevant conduct guideline talk about past conduct that occurred. They're very clear about that. If I'm not pressing my luck, I would say one thing about conscious avoidance, but- Go ahead. Okay, thank you, Your Honor. The argument apparently is any drugs that go through the Central American corridor automatically give rise to a conscious avoidance instruction, that can't be. The idea, I mean, that is essentially it. That the way this was constructed, if you ship drugs to Central America, then you are in some sense trying to avoid knowing where they're going. That wasn't the expert's testimony. His testimony was, people who know about this, our argument was that's not our clients. But people who know about this ship to the Central American corridor because they don't want to get their hands on it. They know perfectly well the drugs are going to the United States, but they don't want to have their hands dirty. Our argument was our clients didn't know that at all. The sentence was ultimately, I'm not saying it matters, but it was ultimately below guidelines, and indeed non-guidelines, right? It was, but it was based on a guidelines range of life. And a four level swing here would bring that way down, very close actually to the actual sentence that was given. And it would be impossible to call that error harmless. We just don't know what Judge Crotty would do. Fair enough, I just want to make sure that that's- Yes, that's correct. The guidelines range, we quarreled with a lot of those enhancements, but the guidelines range was life and the sentence was 216 months. If there were error here though, Judge Crotty could very easily go much further below that on the enhancements. Thank you very much. Thank you all. We'll reserve decision.